UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD HERMAN and HERMAN GLOBAL VENTURES LLC,<br><br>               Plaintiffs,<br><br>          v.<br><br>DEVIN DUNCAN and ONLINE EDUCATION CONSULTING LLC,<br><br>              Defendants. | 17 Civ. 3325 (PGG)<br><br>**MEMORANDUM**<br>**OPINION & ORDER** |
| DEVIN DUNCAN and ONLINE EDUCATION CONSULTING LLC,<br><br>            Third-Party Plaintiffs,<br><br>          v.<br><br>TODD HERMAN INC.,<br><br>            Third-Party Defendant. | |

PAUL G. GARDEPHE, U.S.D.J.:

The Complaint in this action arises from an agreement between Plaintiff Todd Herman and Defendant/Third-Party Plaintiff Devin Duncan to jointly operate a business to market and offer for sale a program known as "The 90 Day Year." The parties operated the business successfully for approximately two years, but on April 24, 2017, Herman terminated the relationship. This diversity action ensued.

Herman and Herman Global Ventures LLC bring a claim for declaratory relief, breach of contract, and unjust enrichment. Duncan and Online Education Consulting LLC bring counterclaims against Herman, Herman Global Ventures, LLC, and Todd Herman Inc. for breach

of contract, unjust enrichment, quantum meruit, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and conversion.

Plaintiffs have moved for summary judgment on their declaratory judgment claims and all of Defendant's counterclaims. Defendants have cross-moved for summary judgment on their breach of contract counterclaim and Plaintiffs' declaratory judgment claim.

In a March 31, 2019 Order, this Court granted Plaintiffs' motion as to (1) their claim for declaratory relief, to the extent that this Court found that the "Partnership Overview" is not an enforceable contract; and (2) Defendants' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion. Plaintiffs' motion for summary judgment was otherwise denied. Defendants' motion for summary judgment was denied in its entirety. The purpose of this memorandum opinion is to explain the Court's reasoning.

## **BACKGROUND**

Plaintiff Todd Herman is a business strategy coach who advises business owners and athletes on matters relating to performance, leadership, and business growth. (Pltf. R. 56.1 Stmt. ¶ 1)[1] In 2004, Herman began using the term "The 90 Day Year" in connection with some of his personal coaching endeavors. (Id. ¶ 2) Prior to 2014, Herman operated his business through two entities: Plaintiff Herman Global Ventures LLC ("HGV") and Third-Party Defendant Todd Herman Inc. (Herman and the Herman entities will be referred to collectively as "Herman"). (Def. R. 56.1 Stmt. ¶ 1)

---

[1] Unless otherwise indicated, the Court cites to facts drawn from Local Rule 56.1 statements because the opposing parties have either not disputed those facts or have not done so with citations to admissible evidence. See Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

Defendant Devin Duncan is a Connecticut resident and the sole member of Defendant Online Education Consulting LLC (collectively, "Duncan"). (Am. Answer (Dkt. No. 33) ¶¶ 8-9) In late 2014, Herman, Duncan, and Duncan's wife, Melanie Duncan, agreed to engage in a test promotion to determine whether the digital marketing of "The 90 Day Year" program could be successful. (Pltf. R. 56.1 Stmt. ¶ 3) In connection with this project, Melanie and Duncan drafted the "90 Day Year Promo Agreement." (Id.) This agreement granted non-party Online Marketing Education LLC non-exclusive use of "The 90 Day Year" program for one promotion. (Id. ¶ 4)[2] The promotion was successful, and Herman paid Duncan and his wife approximately $250,000 in connection with this project. (Id. ¶ 5)

After this initial promotion ended in late March or early April 2015, Herman and Duncan agreed to continue to jointly market and promote "The 90 Day Year" program through a joint venture to be organized and equally owned by them and their respective entities. (Id. ¶¶ 6-7) To this end, in February 2015, the Herman Duncan Joint Venture, LLC ("HDJV") was registered as a Nevada limited liability company. (Def. R. 56.1 Stmt. ¶ 18) On April 10, 2015, Herman and Duncan executed the "Todd Herman & Devin Duncan Partnership Overview" (the "Overview"), which summarized terms on which the parties had agreed and listed certain matters about which the parties had not reached agreement. (Pltf. R. 56.1 Stmt. ¶ 10; see also Def. R. 56.1 Stmt. ¶ 22)

The Overview includes the following terms and unresolved issues:

- HD Joint Ventures LLC in Nevada
- Todd is Managing Partner
- 50/50 ownership between Todd Herman Inc & Online Education Consulting LLC
- 50/50 profit split except as defined below

---

[2] The parties disagree as to whether the "90 Day Year Promo Agreement" is a valid and enforceable agreement. That issue is not material to the dispute at hand.

- Both parties have access to full accounting
- Access to shared employees at cost
  - Details needed for how the hierarchy will work to keep efficiency high
- **How are expenses paid if % split is different on certain projects?**
- Main thing to protect against is setting up a platform and then getting cut out of a pivot.
- All of Todd's future projects, products & entities are possible as a result of this partnership. Therefore all are included but not limited to: internet products, software, JVs, venture capital, private & group coaching. Except as excluded below.
- **LIST EVERYTHING ELSE TODD CURRENTLY DOES THAT SHOULD BE EXCLUDED**
- 90 Day Year IP belong to Todd. This IP is included in the partnership during the partnership's existence.
- Buyout:
- 3 past year average, 8X multiple of 50% profit OR 4x multiple of the highest of the past 3 years on 50% profit, whichever is higher.
- If the next 5 years exceeds average rate of growth from average of past 3, then 50% of the increase over that average i[s] included.
- Formal Operating Agreement to follow

(Duncan Decl. (Dkt. No. 61), Ex. 4 (Overview) (emphasis in original))

Herman and Duncan signed the Overview on April 10, 2015, on behalf of themselves individually and their respective entities, Todd Herman Inc. and Online Education Consulting LLC. (Id.) Duncan drafted the Overview and Herman provided edits. (Pltf. R. 56.1 Stmt. ¶ 10; Def. R. 56.1 Stmt. ¶¶ 30-32) The Overview does not include provisions regarding, inter alia, the term or duration of the joint venture; the responsibilities of Herman and Duncan; when or how a buyout would be implemented; how losses would be shared; or how profit is calculated. (See Duncan Decl. (Dkt. No. 61), Ex. 4 (Overview); see also Pltf. R. 56.1 Stmt. ¶¶ 11, 19)

Although the Overview states that a "Formal Operating Agreement" will "follow" (see Duncan Decl. (Dkt. No. 61), Ex. 4 (Overview) at 2; see also Pltf. R. 56.1 Stmt. ¶ 13), no formal operating agreement was ever executed. (Pltf. R. 56.1 Stmt. ¶ 13)

4

On February 19, 2016, Herman's counsel sent Duncan a 23-page "draft Operating Agreement for HD Joint Ventures, LLC." (Duncan Decl. (Dkt. No. 61), Exs. 5-6) The draft agreement sets forth (1) the purpose of the agreement; (2) definitions of numerous terms used in the agreement; (3) the principal place of business; (4) the term of the agreement; (5) the obligations of Herman and Duncan; (6) how the joint venture will be managed; (7) which matters require unanimous consent of all members; (8) the joint venture's indemnification policy; (9) how members will meet and vote; (10) members' contributions to capital and the joint venture's capital accounts; (11) how profits, losses, and distributions will be computed; (12) membership transfer restrictions; and (13) how the joint venture may be dissolved and the agreement terminated.[3] (Id., Ex. 5 (Draft Operating Agreement))

Duncan replied on February 21, 2016: "I've attached the original partnership outline. Some of the points are different than the operating agreement. I'm not sure what details need to be in the operating agreement and which ones don't." (Id., Ex. 6 (Duncan Feb. 21, 2016 email)) The parties never communicated again about the draft Operating Agreement. (Pltf. R. 56.1 Stmt. ¶ 17)

Herman and Duncan nonetheless jointly operated a business for the online marketing and sale of "The 90 Day Year" program, offering online webinars, coaching, and advisory presentations prepared by Herman. (Pltf. R. 56.1 Stmt. ¶ 24) Clients paid a fee to participate in the program, generally by credit card. (Id.) Herman provided his personal services

---

[3] The draft Operating Agreement provides for the "application of Nevada law." (Id. ¶ 14.3 (capitalization omitted))

and intellectual property to the business, while Duncan provided IT, managerial, administrative, and related services.[4] (Id. ¶ 25; see also Duncan Decl. ¶ 39)

From the outset of the joint venture until February 2017, the parties "had equal access to confidential information related to the business" (Def. Resp. to Pltf. R. 56.1 Stmt. ¶ 31), including "all marketing and related materials; HDJV's bank account; the Quickbooks program containing all general ledger entries; HDJV's accountant . . . and other independent contractors providing services to HDJV; the ASANA digital communication system utilized by them; the Infusionsoft digital database used by Duncan to track digital marketing efforts and potential customers; and other people, documents and information utilized in connection with HDJV's business." (Pltf. R. 56.1 Stmt. ¶ 32)

According to Herman, the parties' joint venture began to breakdown "in early-to-mid 2016." (Id. ¶ 35; see also Herman Decl. ¶ 42) Herman contends that Duncan refused to perform the services he had promised to provide, and Herman was forced to perform these services himself or to hire others to perform these services. (Pltf. R. 56.1 Stmt. ¶ 36; see also Herman Decl. ¶ 43) Herman contends that by February 2017, Duncan had stopped providing services to HDJV. (Pltf. R. 56.1 Stmt. ¶ 37; see also Herman Decl. ¶ 45)

Duncan maintains, however, that he continued to run the "operations and technology side of the company" (Def. Resp. to Pltf. R. 56.1 Stmt. ¶ 36),[5] as evidenced by

---

[4] Duncan claims that he "came up with the idea to sell the 90 Day Year through online channels in two offerings per year at a higher price, which raised the profits of the project exponentially" (see Def. Resp. to Pltf. R. 56.1 Stmt. ¶ 31), but he cites no evidence in support of this assertion.

[5] Duncan cites to his declaration and to Herman's deposition in support of this claim, but neither the declaration nor Herman's deposition demonstrates that Duncan continued to contribute to the joint venture in 2016.

"increased revenue during the June and December 2016 promotions."[6] (Def. Resp. to Pltf. R. 56.1 Stmt. ¶ 35; see also Duncan Decl. ¶¶ 43-45, 53) Duncan denies that he ever voluntarily stopped performing work for HDJV, and complains that Herman removed him from certain HDJV platforms, which prevented Duncan from performing his duties for the company. (Def. Resp. to Pltf. R. 56.1 Stmt. ¶ 37; see also Duncan Decl. ¶¶ 75-77; Siachos Decl. (Dkt. No. 60), Ex. 4 (Herman Dep. Tr.) 338:6-12)

On several occasions during the 2016-17 time period, Herman told Duncan that Herman should receive a greater share of the profits from the joint venture. For example, at an October 2016 meeting with Duncan, "Herman sought a larger percentage of profits for certain products marketed and sold by HDJV." (Def. R. 56.1 Stmt. ¶¶ 66-67) And in a January 22, 2017 email to Duncan, Herman expressed his "worr[ies]" and "frustration[s]" regarding the joint venture:

> When [the joint venture] got started, there were a lot of assumptions on how the business might evolve and how each of us would be involved, but the reality of the business is different than our initial assumptions and I think we have to get clarity on a bunch of key points. Additionally, we've never had a formal operating agreement that was agreed upon and signed, we've just been operating in good faith and we need to get it cleared up.

(Duncan Decl. (Dkt. No. 61), Ex. 7 (Herman Jan. 22, 2017 email) at 2) Herman asserted that he was "carrying too much of the weight of the success of the business," and he wanted to "clearly define Roles & Responsibilities for each of [Herman and Duncan] and the associated value for each under an HDJV agreement." (Id. at 2-3) Herman also wanted to move "ToddHerman.me" – Herman's "personal home site" – under his "umbrella"; to "re-work the percentage split in the

---

[6] Although Duncan claims that revenue increased, he has not proffered financial statements supporting this assertion.

business"; and to obtain clarity as to "how the 90DY product suite works in conjunction with HDJV." (Id. at 2-4)

In a February 17, 2017 email, Herman sent a buyout offer to Duncan.[7] (See Duncan Decl. (Dkt. No. 61), Ex. 8 (Herman Feb. 17, 2017 email)) The next day, Duncan sent Herman an email asking Herman to "[j]ust honor our agreement." (Id. Ex. 9 (Duncan Feb. 18, 2017 email) at 2) Duncan complained that Herman had inserted "deductions for the purpose of misstating actual profits to unfairly decrease the buyout number." (Id.) Duncan also complained that Herman was attempting to re-write the Overview: "Let's not confuse what you wish the contract says, instead of what it clearly has stated from the beginning. . . . [Y]ou are trying to redefine the signed agreement." (Id.) In a February 23, 2017 email to Duncan, Herman wrote: "Of course I intend to comply with our agreement. You and I have a different understanding of the appropriate buy-out amount. . . ." (Id. Ex. 10)

Between February 23, 2017, and the filing of this lawsuit on May 4, 2017, Herman and Duncan traded charges and counter-charges involving Duncan's alleged failure to perform work on the joint venture, and actions Herman had taken to address alleged issues associated with Duncan's bankruptcy. (See, e.g., id., Ex. 11 (Herman Feb. 23, 2017 letter); Ex. 12 (Herman Feb. 27, 2017 email) at DEF 000189)

.

---

[7] The buyout offer was contained in a spreadsheet attached to the email. The spreadsheet has not been provided to the Court. Duncan contends that the offer was "for a fraction of the contractually agreed-upon buyout price in the [Overview]," but he does not provide any evidence of what Herman's offer was nor does he provide any evidence of what the buyout under the Overview should have been. (See Def. R. 56.1 Stmt. ¶ 72; Duncan Decl. (Dkt. No. 61) ¶ 56) Similarly, in disputing Duncan's account, Herman merely cites to the February 17, 2017 email. (Pltf. Resp. to Def. R. 56.1 Stmt. ¶ 72) Accordingly, there is no evidence before the Court as to the substance of the February 17, 2017 buyout offer.

In a February 27, 2017 email to Herman, Duncan complained that he had no obligation to devote more of his time to the joint venture, and he asserted that the solution to the parties' disputes was for Herman to buy him out. (Id. Ex. 12 (Duncan Feb. 27, 2017 email) at DEF 000193) Duncan further argued that his bankruptcy presented no issues for the joint venture, and that any transfer by Herman of the joint venture's banking transactions to another company would breach the parties' agreement and would constitute an "improper attempt [by Herman] to seize complete control of [the joint venture] and divert its revenue and customers to [Herman]." (Id., Ex. 13 (Duncan Apr. 7, 2017 letter); Ex. 15 (Duncan Apr. 18, 2017 letter) at 3) Duncan also asserted that he was not able to perform his IT duties because Herman had "started using a different system that [Duncan was] not included/copied on," and that Herman had "locked [him] out" of the joint venture's software. (Id. Ex. 12 (Duncan Feb. 27, 2017 email) at 2; Ex. 15 (Duncan Apr. 18, 2017 letter) at 3)

In an April 24, 2017 letter, Herman gave notice of his intent "to terminate the [parties' business] arrangement" for the joint operation of HDJV. (Id., Ex. 16 (Herman Apr. 24, 2017 letter)) Herman asked "Duncan and Online Education Consulting, LLC [to] cooperate in the prompt dissolution of HDJV," and warned that Herman and the Herman entities would not provide services to HDJV except "to comply with [their] obligations to existing clients/customers." (Id. at 2) On May 1, 2017, Duncan asserted that the termination was not effective and demanded that it be retracted. (Id., Ex. 17 (May 1, 2017 letter)) Herman filed the instant action on May 4, 2017.

## DISCUSSION

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."

9

Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'" Lesavoy v. Lane, 02 Civ. 10162 (RWS), 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of N.Y., 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment . . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citation omitted).

## II.  CHOICE OF LAW

Before resolving the parties' motions, the Court must first determine whether

New York or Nevada law governs.  When sitting in diversity, federal courts must apply the

forum state's choice-of-law rules.[8]  See, e.g., Fin. One Public Co. v. Lehman Bros. Special Fin.,

Inc., 414 F.3d 325, 331 (2d Cir. 2005).  Accordingly, New York's choice-of-law rules govern

here.  In New York, "[t]he first step in any case presenting a potential choice of law issue is to

determine whether there is an actual conflict between the laws of the jurisdiction involved."

Matter of Allstate Ins. Co., 81 N.Y.2d 219, 223 (1993).  Because Duncan has not shown that

there is a conflict between New York and Nevada law,[9] the Court will apply New York law.  See

Wu v. Pearson Educ., Inc., 277 F.R.D. 255, 268 (S.D.N.Y. 2011) ("[Defendant] has not pointed

to any conflict between the laws of the fifty states that would trigger a choice of law analysis

. . . .").

## III.  BREACH OF CONTRACT

Herman has moved for summary judgment on Duncan's breach of contract

counterclaim on the ground that there is no enforceable agreement between the parties.  (Herman

Br. (Dkt. No. 46) at 8)  Duncan cross-moves for summary judgment on his breach of contract

---

[8] Duncan does not address this threshold issue in his briefing, but instead incorrectly applies
Nevada's choice-of-law rules.  (See Def. Opp. (Dkt. No. 59) at 6; Def.'s Reply (Dkt. No. 55) at
3)

[9] For example, the elements of breach of contract are the same in each state.  (Compare Duncan
Opp. (Dkt. No. 59) at 5 (citing Bernard v. Rockhill Dev. Co., 103 Nev. 132, 134 (1987) (per
curiam)), with id. at 15 (citing Commonwealth Assocs. v. Palomar Med. Tech., Inc., No. 96 Civ.
1868 (HB), 1997 WL 26723, at *1 (S.D.N.Y. Jan. 23, 1997)))  Similarly, the test for
enforceability is the same.  (Compare id. at 9 (citing May v. Anderson, 121 Nev. 668, 672
(2005)), with id. at 15 (citing Kowalchuk v. Stroup, 61 A.D.3d 118, 121 (1st Dep't 2009)))  For
Duncan's unjust enrichment, quantum meruit, good faith and fair dealing, breach of fiduciary
duty, and conversion counterclaims, he admits that the law is the same in both states.  (See
Duncan Opp. (Dkt. No. 59) at 32-34, 38-39, 42-43)

counterclaim, arguing that the Overview is an enforceable agreement and that Herman breached it by, inter alia, not abiding by the buyout provision. (Duncan Opp. (Dkt. No. 59) at 3)

### A.  Legal Standard

"Under New York law, there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)). "'To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" Tractebel Energy Mktg. v. AEP Power Mktg., Inc., 487 F.3d 89, 95 (2d Cir. 2007) (quoting Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589 (1999)). "'To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound.'" Kolchins v. Evolution Mkts., Inc., 128 A.D.3d 47, 59 (1st Dep't 2015) (citation omitted) (quoting Kowalchuk, 61 A.D.3d at 121).

"That meeting of the minds must include agreement on all essential terms. . . . [A]lthough the parties may intend to enter into a contract, if essential terms are omitted from their agreement, or if some of the terms included are too indefinite, no legally enforceable contract will result." Id. at 59-61 (citations omitted); see also Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109-10 (1981) ("[I]t is rightfully well settled in the common law of contracts in this State that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." (citation omitted)). "But it is also plain that all the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to have legal sufficiency." Kolchins, 128 A.D.3d at 61 (citing Cobble Hill Nursing

Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 483 (1989); 21 N.Y. Jur. 2d Contracts § 20; 1 CORBIN ON CONTRACTS § 95 (1950)).

Under New York law, "[o]rdinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." Adjustrite Sys., Inc. v. GAB Bus. Serv., Inc., 145 F.3d 543, 548 (2d Cir. 1998). "In some circumstances, however, preliminary agreements can create binding obligations." Id. Binding preliminary agreements fall into one of two categories. An agreement falls into the first category where "the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." Id. In such circumstances, "[a] binding preliminary agreement [exists] . . . in recognition that, 'despite the anticipation of further formalities,' a contract has been reached." Id. (quoting Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987)). The Court will refer to this type of binding preliminary agreement as a "Type I agreement."

"The second type of preliminary agreement, dubbed a 'binding preliminary commitment' by Judge Leval, is binding only to a certain degree." Adjustrite, 145 F.3d at 548. "It is created when the parties agree on certain major terms, but leave other terms open for further negotiation." Id. The parties "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement." Tribune, 670 F. Supp. at 498. In contrast to a fully binding preliminary agreement, a "binding preliminary commitment" "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework." Id. "A party to such a binding preliminary commitment has no right to demand performance of the

transaction." Adjustrite, 145 F.3d at 548. "Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing." Id. The Court will refer to this type of binding preliminary agreement as a "Type II agreement."

In determining whether a preliminary agreement is binding, courts "must keep two competing interests in mind." Adjustrite, 145 F.3d at 548. First, courts must be wary of "trapping parties in surprise contractual obligations that they never intended" to enter. Tribune, 670 F. Supp. at 497; accord Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989). Second, "courts [must] enforce and preserve agreements that were intended [to be] binding, despite a need for further documentation or further negotiation," for it is "the aim of contract law to gratify, not to defeat, expectations." Tribune, 670 F. Supp. at 498; see also id. at 499 ("courts should not . . . disappoint legitimately bargained contract expectations"). The key "is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." Adjustrite, 145 F.3d at 548-49. "To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'" Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1986) (alteration in original) (quoting R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir. 1984)). "Subjective evidence of intent, on the other hand, is generally not considered." Adjustrite, 145 F.3d at 549 (citing Rule v. Brine, Inc., 85 F.3d 1002, 1010 (2d Cir. 1996)).

In determining whether parties to a preliminary agreement intended to be bound even in the absence of a formal document, courts consider the following factors:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed

14

upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

Winston, 777 F.2d at 80. These circumstances may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings." RESTATEMENT (SECOND) OF CONTRACTS § 27 comment c (1981).

### B. Analysis

Here, Herman contends that he is entitled to summary judgment on Duncan's breach of contract counterclaim, because the Overview is not an enforceable contract. (Pltf. Br. (Dkt. No. 46) at 8-21) Duncan argues that he is entitled to summary judgment on his breach of contract counterclaim, because the Overview is an enforceable agreement that Herman has breached. (Def. Opp. (Dkt. No. 59) at 3-26)

As to the enforceability of a preliminary agreement, "[t]he Court of Appeals' first and most important factor looks to the language of the preliminary agreement for indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities." Tribune, 670 F. Supp. at 499. Here, the Overview explicitly contemplates a "Formal Operating Agreement," and this evidence is entitled to considerable weight. Moreover, the Overview does not include language signaling a binding contract, such as the word "agreement."[10] Compare id. at 499-500 (finding evidence of intent to be bound where parties' correspondence was "replete with the terminology of binding contract," such as "'evidence acceptance [by executing below],'" and "'[u]pon receipt . . . our agreement . . . shall

---

[10] By contrast, the draft "Formal Operating Agreement" that was never executed begins as follows: "This Agreement of HD JOINT VENTURES, LLC is hereby adopted as the limited liability company agreement of HD JOINT VENURES, LLC, a Nevada limited liability company, and is hereby executed, ratified, confirmed and approved for good and valuable consideration by TODD HERMAN and DEVIN DUNCAN as Members." (Duncan Decl. (Dkt. No. 61), Ex. 5 (Draft Operating Agreement) at 2 (emphasis in original))

15

become a binding agreement between us'") with Brown v. Cara, 420 F.3d 148, 151 (2d Cir. 2005) (two-page memorandum of understanding executed by the parties found unenforceable where it contained no language evidencing a binding contract).

Duncan argues that the first factor weighs in favor of enforceability, because the Overview does not (1) contain an express reservation of rights; (2) use the term "non-binding"; and (3) expressly condition performance on the execution of a definitive agreement. The "'fact that [a] preliminary agreement contains no express reservation of the right not to be bound is not dispositive of whether it is binding[, however, because] a reservation of right not to be bound presumes that there is some expression of commitment or agreement in the writing.'" Brown, 420 F.3d at 154 (first alteration in original) (quoting WILLISTON ON CONTRACTS § 4:8). "Where there is no language that may be read to bind the parties to the ultimate goal, an explicit reservation would serve no purpose." Id.

Although the parties here signed and dated the Overview, they did not include language in the Overview signaling that they had reached a binding agreement. See id. at 151 (two-page memorandum of understanding found unenforceable, even though parties had agreed to "work together to develop, build, market and manage a new real estate venture planned for an existing site" (internal quotation marks omitted)). Finally, Duncan – the party urging the Court to find an enforceable agreement – drafted the Overview.[11] Diagnostic Med. Assoc., M.D., P.C.

---

[11] Duncan contends that his use of the words "Partnership Overview" rather than "Agreement" – or some other term signaling a binding agreement – should be given little weight, because he is not an attorney and did not understand the significance of his word choice. (See Duncan Reply (Dkt. No. 55) at 6)  At the end of the Overview, however, Duncan wrote "Formal Operating Agreement to follow" (Duncan Decl. (Dkt. No. 61), Ex. 4 (Overview); see also Siachos Decl. (Dkt. No. 60), Ex. 5 (Duncan Dep. Tr.) at 216:5-10), indicating that he understood the difference between the formal binding agreement contemplated by the parties and the document he had prepared.

16

v. Guardian Life Ins. Co. of Am., 157 F. Supp. 2d 292, 297 (S.D.N.Y. 2001) ("[A]ccording to the rule of contra preferentum, that is, when one party in a dispute was responsible for drafting the contract at issue (presumably the stronger party), all ambiguities in the contract are resolved against the drafting party." (citing Pagan v. NYNEX Pension Plan, 52 F.3d 438, 443 (2d Cir. 1995))); see also M. Fortunoff of Westbury Corp. v. Peerless Ins. Co., 432 F.3d 127, 142 (2d Cir. 2005) ("[T]he doctrine of contra preferentum [invites courts] to interpret . . . ambiguities against the drafter of the contract. . . .").

Duncan also argues that Herman subjectively believed that the Overview was a binding agreement. In this regard, Duncan cites to (1) Herman's deposition, in which he testified that he believed the Overview provided "certain rights and responsibilities and duties of [the] parties to the joint venture"; and (2) a Herman email in which he allegedly refers to the Overview as an agreement.[12] (Siachos Decl. (Dkt. No. 60), Ex. 4 (Herman Dep. Tr.) at 311:2-6; Duncan Decl. (Dkt. No. 61), Ex. 10 (Herman Feb. 23, 2017 email)) "Subjective evidence of intent . . . is generally not considered," however. Adjustrite, 145 F.3d at 549; see also Rule, 85 F.3d at 1010 ("Under New York law, . . . the question of whether or not a binding contract exists 'is not dependent on the subjective intent' of either party." (quoting Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp., 41 N.Y.2d 397, 399 (1977))).

The first factor weighs in favor of finding that the Overview is not an enforceable agreement.

The second factor looks to whether there has been partial performance. See, e.g., Winston, 777 F.2d at 80. Here, Duncan argues – and Herman does not dispute – that the parties

---

[12] Because Duncan has not provided the surrounding emails, the context for Herman's statement is not clear, rendering the email of little probative value.

"complied with" most of the Overview's terms for the two years of their working relationship. (See Def. R. 56.1 Stmt. ¶ 38 (LLC formed);[13] ¶ 40 (50/50 ownership); ¶ 44 (expenses); ¶ 48 (excluded projects); ¶¶ 50, 60 (profit split); ¶ 54 (funding of first promotion); ¶ 56 (accounting access); ¶ 58 (employee access); ¶ 64 (Grit & Hustle ownership))[14] Accordingly, the second factor weighs in favor of finding an enforceable agreement. See, e.g., In Matter of Application of NAP, Inc., No. 96 Civ. 640 (LLS), 1996 WL 221623, at *4 (S.D.N.Y. May 1, 1996) (performance over eight months is evidence of enforceable agreement), aff'd sub nom. NAP, Inc. v. FRAJAC, 104 F.3d 350 (2d Cir. 1996); Viacom Int'l Inc. v. Tandem Prods., Inc., 368 F. Supp. 1264, 1270 (S.D.N.Y. 1974) (performance for a year is evidence of an enforceable agreement), aff'd, 526 F.2d 593 (2d Cir. 1975).

      In connection with the third factor, courts consider "whether all of the terms of the alleged contract have been agreed upon." Winston, 777 F.2d at 80. While parties need not fix every term "with complete and perfect certainty for a contract to have legal efficacy," Kolchins, 128 A.D.3d at 61, material terms should not be missing altogether. See, e.g., Rule, 85 F.3d at 1010 ("[U]nder New York law no enforceable contract comes into being when the parties leave a material term for future negotiations. . . ." (citing Joseph Martin, 52 N.Y.2d at 109)) Terms fixing duration, payment, and the parties' obligations are central to the formation of any contract, see, e.g., Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 392 (E.D.N.Y. 2015) (material terms include "'subject matter, price, payment terms, quantity, duration, compensation, and the

---

[13] Although Herman does not dispute that the HD Joint Venture LLC was formed in accordance with the Overview, the Court notes the LLC was formed before the Overview was executed. Accordingly, the formation of the LLC does not demonstrate that the Overview was intended to be an enforceable agreement. (See Def. R. 56.1 Stmt. ¶ 18)

[14] The parties disagree as to whether the Overview's provisions regarding a $50,000 reserve and intellectual property ownership were complied with. (Compare id. ¶¶ 52, 62, with Pltf. Resp. to Def. R. 56.1 Stmt. ¶ 52 ($50,000 reserves), ¶ 62 (IP ownership))

dates of delivery and production, so that the promises and performance to be rendered by each party are reasonably certain'" (quoting 17A Am. Jur. 2d Contracts § 190 (2015))), but here these material terms are not addressed with specificity in the Overview.[15]

Other material terms are referenced in the Overview, but are left unresolved. For example, the Overview states that "[d]etails [are still] needed for how the hierarchy will work to keep efficiency high." (Duncan Decl. (Dkt. No. 61), Ex. 4 (Overview)) The Overview also acknowledges that the parties need to decide "[h]ow . . . expenses [are] paid if % split is different on certain projects," and notes that, for "[m]anual intensive projects," the 50/50 split should be adjusted, but does not specify how the split will be adjusted. (Id. (emphasis omitted)) Finally, the Overview notes that the parties must still "list everything else Todd [Herman] currently does that should be excluded" from the joint venture.[16] (Id. (emphasis and capitalization omitted)) The existence of these open terms weighs strongly in favor of not finding a binding agreement. Vacold, 545 F.3d at 128 ("The existence of open terms 'is always a factor tending against the conclusion that the parties have reached a binding agreement'. . . ." (quoting Tribune, 670 F. Supp. at 499).

---

[15]  Duncan argues that the only "'indispensable element[s]'" of a joint venture are the "'undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses.'" (Duncan Opp. (Dkt. No. 59) at 21 (alteration in original) (quoting Turner v. Temptu Inc., No. 11 Civ. 4144 (JMF), 2013 U.S. Dist. LEXIS 114298, at *17 (S.D.N.Y. Aug. 13, 2013))) But in Turner, the court found no enforceable agreement where the parties had agreed on "ownership percentages, voting, roles and responsibilities, rights upon dissolution, the skills to be contributed by each, [and] management and control." Id. at *14-15 (internal quotation marks omitted). Because the parties had not "agree[d] as to how losses would be shared," the court found that no enforceable agreement existed. Id. at *15. The same defect exists here. (See Duncan Decl. (Dkt. No. 61), Ex. 4 (Overview))

[16]  Herman also argues that the Overview does not provide a definition for "[g]roup coaching/mastermind." Herman testified, however, that the parties were able to comply with this provision without a specific definition of "group coaching" or "mastermind." (Siachos Decl. (Dkt. No. 60), Ex. 3 (Herman Dep. Tr.) at 190:8-22; Def. R. 56.1 Stmt. ¶¶ 59-60)

Because certain material terms are not addressed in the Overview, while other material terms are acknowledged but left unresolved, the third factor weighs in favor of not finding an enforceable agreement.

In connection with the fourth factor, courts consider whether the agreement at issue is of a type that is usually committed to writing. E.g., Winston, 777 F.2d at 80. Duncan argues that this factor weighs in his favor, because the joint venture deal at issue was "not a complex transaction." (Def. Opp. (Dkt. No. 59) at 22)

Transactions that involve a substantial sum of money and intellectual property rights, and that have a significant duration, are ordinarily reduced to a formal contract. See, e.g., Adjustrite, 145 F.3d at 551 (where transaction involved "a million-dollar acquisition," intellectual property rights, and a five-year term, court found that the transaction "was of [a] type that ordinarily would be committed not only to a writing but to a formal contract"); see also Brown, 420 F.3d at 154-55 ("'duration of [an] alleged agreement'" is "particularly significant in determining whether [the agreement] must be reduced to a formal writing in order to be fully enforceable" (alteration in original) (quoting Warwick Assocs. v. FAI Ins. Ltd, 275 A.D.2d 653, 654 (1st Dep't 2000))).

As to duration, Duncan testified that he believed that the joint venture relationship was "perpetual" and would continue "forever" "[f]or all of Todd's future projects." (Shelley Decl. (Dkt. No. 51), Ex. 3 (Duncan Dep. Tr.) at 203:2-204:10) Moreover, the parties' joint venture had revenue of more than $1 million and involved Herman's intellectual property rights in "The 90 Day Year," "Technology IP," and "Grit & Hustle IP." (See Duncan Decl. (Dkt. No. 61), Ex. 4 (Overview); Pltf. R. 56.1 Stmt. ¶¶ 48-50; Shelley Decl. (Dkt. No. 51), Ex. 3 (Duncan

Dep. Tr.) at 203:2-204:10) Given these circumstances, a formal contract would be expected. Accordingly, the fourth factor weighs in favor of not finding an enforceable agreement.

*    *    *    *

As to three of the four Winston factors, analysis indicates that the parties did not intend to be bound until the "Formal Operating Agreement" was negotiated and executed. The one factor that supports a contrary conclusion – partial performance – is not sufficient to raise a genuine issue of material fact, because no reasonable factfinder could conclude that the parties agreed on all material elements of the joint venture, intended to be fully bound when they signed the Overview, and considered the "Formal Operating Agreement" an unnecessary formality. See Adjustrite, 145 F.3d at 551 (affirming summary judgment dismissing breach of contract claim where "partial performance" was the only factor supporting a finding of an enforceable agreement); see also Arcadian, 884 F.2d at 72-73 (affirming grant of summary judgment dismissing breach of contract claim even though there was "considerable partial performance").

Duncan argues, however, that even if the parties did not enter into a "Type I" binding preliminary agreement, they entered into a "Type II" preliminary agreement, in which Herman was obligated to "continue to negotiate, in good faith, the 'open' terms." (Duncan Opp. (Dkt. No. 59) at 22-23); see also Brown, 420 F.3d at 153 ("Type II agreements 'do[ ] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework.'") (alterations in Brown) (quoting Adjustrite, 145 F.3d at 548)).

Herman contends, however, that Duncan did not allege a Type II preliminary agreement in his third-party complaint and that, accordingly, the Court need not consider the issue. Herman relies on New York Metro Peterbilt, Inc. v. Peterbilt Motors Co., No. 13-cv-843

21

(DRH), 2015 WL 1469212, at *4 (E.D.N.Y. Mar. 30, 2015) and Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria, 265 F.R.D. 106, 126 n.8 (S.D.N.Y. 2010).

In Peterbilt, the court held that because the complaint did not assert that defendant "was obligated to negotiate any open terms in good faith," the court was limited to deciding whether the parties had a Type I agreement. Peterbilt, 2015 WL 1469212, at *4. And in Madu, Edozie, the court held that it "need not apply the Type I four factor test to the Agreement," because plaintiffs had not asserted in the complaint that the agreement in question was a Type I agreement. Madu, Edozie, 265 F.R.D. at 126 n.8.

In response, Duncan cites Network Enterprises, Inc. v. APBA Offshore Productions, Inc., No. 01 Civ. 11765 (CSH), 2006 U.S. Dist. LEXIS 67564, at *10-11 (S.D.N.Y. Sept. 18, 2006) and Network Enterprises, Inc. v. APBA Offshore Productions, Inc., 427 F. Supp. 2d 463, 467 (S.D.N.Y. 2006). In Network Enterprises, the parties had a binding agreement obligating defendant to purchase time from and exhibit programs on plaintiff's cable network. Defendant agreed to exhibit ten half-hour episodes on plaintiff's network on consecutive weeks in 2000. Network Enterprises, 427 F. Supp. 2d at 467. The agreement included a Renewal Option Rider that gave defendant the option to exhibit thirteen additional episodes on plaintiff's network in 2001. Id. at 468. The dates and times of those telecasts were to "be mutually agreed to by the parties." Id.

After a bench trial, the court found that the renewal option created a Type II agreement whereby the parties agreed to negotiate the dates and times of the 2001 telecasts in good faith. Id. at 484-85. When defendant challenged that aspect of the court's ruling – arguing that the complaint did not include a claim for a Type II agreement – the court held that the "obligation to negotiate open terms in good faith . . . is contractual in nature," and so the court

22

could determine, based on the contract, whether the parties also had a Type II agreement. Network Enterprises, 2006 U.S. Dist. LEXIS 67564, at *10. In the alternative, the court ruled that the parties had tried the issue by consent pursuant to Fed. R. Civ. P. 15(b)(2), and therefore the court could treat the claim as if it were raised in the pleadings. Id. at *11 n.3; see also Fed. R. Civ. P. 15(b)(2).

Network Enterprises is of no assistance to Duncan. As an initial matter, there is no claim of implied consent, and Rule 15(b)(2) is not applicable. Moreover, the parties in Network Enterprises had entered into an enforceable contract, and the court considered the enforceability of the option provision in that context. Here, the Overview does not address numerous material terms, and the parties did not agree that these material terms would later be "mutually agreed to by the parties." Finally, there is no evidence that Herman refused to negotiate the open items in good faith; indeed, there is no evidence that Duncan sought to negotiate the open items during the parties' two-year relationship. Given Duncan's failure to allege in his breach of contract counterclaim that Herman breached an obligation to negotiate the open items in good faith, he will not be heard to allege that Herman breached a Type II preliminary agreement.

Because there was no enforceable agreement between the parties, Plaintiffs are entitled to summary judgment on Defendants' breach of contract counterclaim, and Defendants' cross-motion for summary judgment on their breach of contract counterclaim is denied.

## II.   DECLARATORY JUDGMENT

Herman asks the Court for a declaration that:

1. the Partnership Overview did not create a binding and enforceable agreement;

2. the parties did not otherwise enter into a binding and enforceable agreement;

3. Herman was legally entitled to stop providing services to HDJV related to "The 90 Day Year" effective April 24, 2017, and to thereafter provide services related to "The 90 Day Year" however and to whomever he chooses, including to HGV;

4. the arrangement between the parties resulting in the creation of HDJV was validly terminated effective April 24, 2017;

5. Defendants (individually and/or on behalf of HDJV) are not authorized to market, sell or otherwise use Herman's intellectual property, including, without limitation, any rights or content related to "The 90 Day Year";

6. Defendants are not authorized to operate HDJV; and

7. Defendants are not authorized to hold themselves out as affiliates or in any way related to "The 90 Day Year" program or Herman.

(Herman Br. (Dkt. No. 46) at 25-26)

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The Act thus "confers on federal courts 'unique and substantial discretion in deciding whether to declare the rights of litigants.'" Peconic Baykeeper, Inc. v. Suffolk Cnty., 600 F.3d 180, 187 (2d Cir. 2010) (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)).

In determining whether declaratory relief is warranted, "[t]he court must consider whether a declaratory judgment will (1) 'serve a useful purpose in clarifying and settling the legal relations in issue;' or (2) 'afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Camofi Master LDC v. Coll. P'ship, Inc., 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006) (quoting Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir. 1992)). When the court in its discretion determines that either of these conditions is satisfied, it is "'required to entertain a declaratory judgment action.'" Cosa Instrument Corp. v. Hobré

Instruments BV, 698 F. Supp. 2d 345, 350 (E.D.N.Y. 2010) (emphasis omitted) (quoting Starter

Corp. v. Converse Inc., 84 F.3d 592, 597 (2d Cir. 1996)).

Here, it is clear that there is an "actual controversy" between the parties and that a

grant of declaratory relief would "serve a useful purpose in clarifying and settling the legal

relations in issue." Cont'l Cas. Co., 977 F.2d at 737. Therefore, the Court will consider

Plaintiffs' request for declaratory relief.

As discussed above, the Court concludes that there was no enforceable agreement

between the parties. Accordingly, in its March 31, 2019 Order, the Court granted Herman's

request for a declaration that the Overview did not create a binding and enforceable agreement,

and that the parties did not otherwise enter into a binding and enforceable agreement with respect

to their joint venture.

Herman provides no legal authority for his remaining requests for declaratory

relief, and accordingly his request for summary judgment as to those requests was denied. In

particular, it is not clear what relief Herman seeks as to HDJV. For example, Herman concedes

that he is not allowed to withdraw as a member of HDJV until HDJV is properly dissolved.

(Herman Reply (Dkt. No. 52) at 24-25) Indeed, Herman states that he "seeks no relief with

respect to the continued existence of HDJV or his membership interest therein. There is no

dispute that HDJV continues to exist and Herman and Duncan each continue to own 50% of the

membership interests in HDJV." (Id. at 25) Given these representations, it is not clear what

Herman is seeking in requesting a declaration that the parties' agreement is terminated and that

he is authorized to cease providing services. Herman has likewise not demonstrated that

Defendants are not entitled to operate HDJV, are not entitled to use "The 90 Day Year" program

in connection with HDJV and are not authorized to hold themselves out as affiliates or in any

way related to "The 90 Day Year" program or Herman. Accordingly, Herman is not entitled to summary judgment as to his remaining requests for declaratory relief.

## IV.    DEFENDANTS' REMAINING COUNTERCLAIMS

Herman argues that he is entitled to summary judgment on Duncan's counterclaims for unjust enrichment, quantum meruit, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and conversion.

### A.    Unjust Enrichment

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006) (internal quotation marks omitted). "'The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement.'" Id. at 586 (emphasis omitted) (quoting Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561, 572 (2005)); see also Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790 (2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract [claim.]"). Accordingly, "'[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery [for unjust enrichment] for events arising out of the same subject matter.'" Beth Israel Med. Ctr., 448 F.3d at 587 (quoting Clark-Fitzpatrick, 70 N.Y.2d at 388).

Herman argues that he is entitled to summary judgment on Duncan's unjust enrichment claim for four reasons. First, because there was no enforceable agreement and the parties' arrangement was terminable at will, the termination does not violate "'equity and good conscience.'" (Herman Br. (Dkt. No. 46) at 26 (quoting Kidz Cloz, Inc. v. Officially for Kids, Inc., 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004))) Second, after Herman's termination, Duncan

is not entitled to share the profits Herman earns on "The 90 Day Year" program. (Id. at 27) Third, because Duncan "made no contribution to the business subsequent to April 2017," he is not entitled to restitution. (Id.) Fourth, if Duncan seeks to recover funds from HDJV, he is required to name HDJV as a party to this action. (Id.)

Duncan responds that "Plaintiffs' abrupt departure from HDJV and operation of a competing company, HGV, and misappropriation of HDJV's assets, including Defendants' online platform and marketing strategies for the 90 Day Year," justify restitution. (Duncan Opp. (Dkt. No. 59) at 33)

The Court concludes that there are disputed issues of material fact concerning (1) Duncan's involvement in the operation of HDJV in early 2017; and (2) whether Plaintiffs' operation of HGV is improper given that Herman is still a member of HDJV. For example, Duncan claims that he worked for HDJV until April 24, 2017, whereas Herman claims that Duncan stopped providing services in early-to-mid 2016 and ceased providing all services by February 2017. As to Herman's operation of HGV, Duncan claims that Herman – through HGV – used the "bi-annual promotions" and "live events" – which were Duncan's marketing strategies – even though they belong to HDJV, whereas Herman claims that he only used his own intellectual property, "The 90 Day Year," in connection with HGV's operations. The parties likewise dispute whether HDJV's profits were split 50/50 in early 2017. Because there are material issues of fact concerning these matters, Herman is not entitled to summary judgment on Duncan's unjust enrichment counterclaim.[17]

---

[17] Herman also contends that Duncan's unjust enrichment claim must "be asserted against HDJV" to the extent Duncan is seeking to recover funds "currently held by HDJV in its bank account." (Herman Br. (Dkt. No. 46) at 27) Duncan responds that Herman, HGV, and Todd Herman Inc. are the proper parties because they currently "market and sell the 90 Day Year program using Defendants' online platform and channels." (Duncan Opp. (Dkt. No. 59) at 34)

## B.    *Quantum Meruit*

The elements of a quantum meruit claim are "(1) performance of services in good faith; (2) acceptance of services by the person to whom they are rendered, (3) expectation of compensation therefor, and (4) reasonable value of the services rendered." E.g., Evans-Freke v. Showcase Contracting Corp., 85 A.D.3d 961, 962 (2d Dep't 2011) (citation omitted). As discussed above, there are disputed material issues of fact as to whether Duncan performed services for HDJV in good faith between early 2016 and April 2017, and whether Herman accepted those services.[18] Therefore, Herman is not entitled to summary judgment on Duncan's quantum meruit counterclaim.

## C.    **Breach of the Implied Covenant of Good Faith and Fair Dealing**

"The covenant of good faith and fair dealing, implied in every contract under New York law, 'includes "an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the

---

Because Herman has cited no authority in support of his argument, he has not demonstrated that he is entitled to summary judgment on this counterclaim. See, e.g., Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 246 (2d Cir. 2004) ("[T]he moving party [at summary judgment] must . . . establish that the undisputed facts entitle him to 'a judgment as a matter of law.'" (quoting Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996) (per curiam))); see also Field Day, LLC v. Cnty. of Suffolk, No. 04 Civ. 2202 (DRH), 2005 WL 2445794, at *18 n.8 (E.D.N.Y. Sept. 30, 2005) ("[B]ecause [the plaintiff] cites absolutely no authority to support [its argument], the Court will not consider it."), aff'd in relevant part, 463 F.3d 167 (2d Cir. 2006).

[18] As with Defendants' unjust enrichment counterclaim, Herman argues that "any expectation of [Duncan for] payment would have been from HDJV, not Herman," and that accordingly, Duncan's quantum meruit counterclaim fails because he has not named HDJV as a party. (Herman Br. (Dkt. No. 46) at 28) Duncan counters that he is "entitled to recovery from Herman, and his entity HGV, [because they] benefited and continue to benefit from Duncan's online platform and marketing strategies." (Duncan Opp. (Dkt. No. 59) at 35) Because Herman has cited no authority in support of his argument, he has not demonstrated that he is entitled to summary judgment on this counterclaim. See, e.g., Vt. Teddy Bear, 373 F.3d at 246 ("[T]he moving party [at summary judgment] must . . . establish that the undisputed facts entitle him to 'a judgment as a matter of law.'" (quoting Champion, 76 F.3d at 486).

agreement on his part."'" Kader v. Paper Software, Inc., 111 F.3d 337, 342 (2d Cir. 1997)

(emphasis in original) (quoting Carvel Corp. v. Diversified Mgmt. Grp., Inc., 930 F.2d 228, 230

(2d Cir. 1991)). However, when there is no contract between the parties, an implied covenant

claim fails. See, e.g., FCOF UB Sec., LLC v. MorEquity, Inc., 663 F. Supp. 2d 224, 231-32

(S.D.N.Y. 2009). Here, because there is no enforceable agreement between the parties, Plaintiffs

are entitled to summary judgment on Defendants' good faith and fair dealing counterclaim.

### D.  **Breach of Fiduciary Duty**

Under New York law,

> [a] fiduciary relationship exists between two persons when one of them is under a
> duty to act for or to give advice for the benefit of another upon matters within the
> scope of the relation. Such a relationship, necessarily fact-specific, is grounded in
> a higher level of trust than normally present in the marketplace between those
> involved in arms' length business transactions. Generally, where parties have
> entered into a contract, courts look to that agreement to discover . . . the nexus of
> [the parties'] relationship and the particular contractual expression establishing
> the parties' interdependency. . . . However, it is fundamental that fiduciary
> liability is not dependent solely upon an agreement or contractual relation
> between the fiduciary and the beneficiary but results from the relation.

EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19-20 (2005) (second and third alteration in

original) (citations and internal quotation marks omitted). In determining whether a fiduciary

relationship exists, "the 'ongoing conduct between parties' must be considered in order to assess,

for example, 'whether a party reposed confidence in another and reasonably relied on the other's

superior expertise or knowledge.'" United Feature Syndicate, Inc. v. Miller Features Syndicate,

Inc., 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002) (quoting Wiener v. Lazard Freres & Co., 241

A.D.2d 114, 122 (1st Dep't 1998)). "While the 'exact limits' of what constitutes a fiduciary

relationship are 'impossible of statement,' a fiduciary relationship may be found in any case 'in

which influence has been acquired and abused, in which confidence has been reposed and

betrayed.'" Id. at 218 (quoting Penato v. George, 52 A.D.2d 939, 942 (2d Dep't 1976)).

Under New York law, parties who enter into a joint venture owe each other fiduciary obligations. E.g., Fisher v. Tice, No. 15 Civ. 955 (LAK)(DF), 2016 WL 4626205, at *12 (S.D.N.Y. July 5, 2016) ("[A] joint venture creates a fiduciary relationship among the joint venturers."), adopted by, 2016 WL 4719759, aff'd, 692 F. App'x 54 (2d Cir. 2017); Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 442 (S.D.N.Y. 2006); see also Meinhard v. Salmon, 249 N.Y. 458, 463-64 (1928) ("Joint adventurers . . . owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. . . . Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.").

To establish a breach of fiduciary duty, a party must prove "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011).

Here, it is undisputed that Herman, Duncan, and their respective entities formed the joint venture, HDJV.[19] Accordingly, under New York law, the parties owed a fiduciary duty to each other.[20] E.g., Solutia, 456 F. Supp. 2d at 442. Duncan argues that Herman knowingly breached that duty by "(1) removing or severely limiting Duncan's access to company platforms . . . ; (2) directing revenue that belonged to HDJV to HGV; and (3) failing to pay Duncan his share of profits in 2017, and . . . failing to disclose the total revenue and profit derived from

---

[19] As discussed above, Herman does not dispute that the joint venture still exists. Accordingly, his argument that Duncan is only entitled to "an accounting" – because the "partnership at will" has been dissolved – is unavailing. (Herman Br. (Dkt. No. 46) at 33-34)

[20] Herman argues that the parties only owed a fiduciary duty to HDJV. He cites no authority in support of this argument, and it contradicts New York law. See, e.g., Fisher, 2016 WL 4626205, at *12 ("[A] joint venture creates a fiduciary relationship among the joint venturers.").

30

sales." (Duncan Opp. (Dkt. No. 59) at 40-41 (citations omitted)) As discussed above, these claims present material issues of fact. Accordingly, Herman is not entitled to summary judgment on Duncan's breach of fiduciary counterclaim.

## E.    **Conversion**

"'Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property.'" Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 53 (2d Cir. 1993) (quoting Meese v. Miller, 79 A.D.2d 237, 242 (4th Dep't 1981)). When the original possession is lawful, "'conversion does not occur until the defendant refuses to return property after demand or until he sooner disposes of the property.'" Id. at 54 (quoting Johnson v. Gumer, 94 A.D.2d 955, 955 (4th Dep't 1983)).

"[U]nder New York law, conversion is established when '(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'" R.B. Dev., Co. v. Tutis Capital LLC, No. 12 Civ. 1460 (CBA) (SMG), 2015 U.S. Dist. LEXIS 177275, at *10 (E.D.N.Y. Nov. 6, 2015) (quoting Bandler v. BPCM NYC, Ltd., No. 12 Civ. 3512 (PGG), 2014 WL 5038407, at *12 (S.D.N.Y. Sept. 28, 2014)), adopted by, 2017 U.S. Dist. LEXIS 204265 (E.D.N.Y. Dec. 11, 2017). "However, an action for conversion cannot be validly maintained 'where damages are merely being sought for breach of contract.'" Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (quoting Peters Griffin Woodward, Inc. v. WCSC, Inc., 88 A.D.2d 883, 884 (1st Dep't 1982)). "Rather, a plaintiff mush show acts that were unlawful or wrongful as opposed to mere violations of contractual rights." Id.

31

The monies at issue here are HDJV's 2017 earnings. Duncan claims that his share of HDJV's profits for 2017 has not been paid out to him in accordance with the parties' agreement. Herman asserts, however, that he has not paid out revenue earned by HDJV since January 23, 2017. (See Pltf. R. 56.1 Stmt. ¶ 49)

A conversion claim cannot be made where a partnership or joint venture still exists. E.g., Dalury v. Rezinas, 183 A.D. 456, 460 (1st Dep't 1918) ("If one partner betrays his trust, and converts to his own use partnership property, he incurs the usual liability that one partner incurs to another respecting partnership affairs – i.e., to be held liable in an accounting; but he cannot be sued by the other partner for damages in an action for conversion."); accord In re Ziedman, 158 B.R. 893, 896 (Bankr. E.D.N.Y. 1993); Sohon v. Rubin, 282 A.D. 691, 691 (1st Dep't 1953) (per curiam); see also Asdourian v. Konstantin, 93 F. Supp. 2d 296, 298 (E.D.N.Y. 2000) (recognizing the "general rule" that a co-joint venturer may not maintain an action for conversion against its co-joint venturer). Because the parties' joint venture, HDJV, still exists, Plaintiffs are entitled to summary judgment on Defendants' conversion counterclaim.

## CONCLUSION

For the reasons stated above, this Court's March 31, 2019 Order granted Plaintiffs' motion for summary judgment on (1) Defendants' counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion; and (2) Plaintiffs' claim for declaratory relief, to the extent Plaintiff seeks a declaration that there is no enforceable contract between the parties. Plaintiff's summary judgment motion was otherwise denied. The Court denied Defendants' cross-motion for summary judgment in its entirety.

It is hereby ORDERED that trial in this matter will begin on **July 8, 2019 at 9:30 a.m.**, in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York,

New York. The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pretrial order, motions in limine, proposed voir dire, and requests to charge are due on **June 7, 2019**. Responsive papers, if any, are due **June 14, 2019**. There will be a final pretrial conference on **June 21, 2019 at 4:00 p.m.**

Dated: New York, New York
      May 16, 2019

SO ORDERED.

Paul G. Gardephe
United States District Judge